Marjorie A. MULLINS, Plaintiff,

v.

CLINCHFIELD COAL CORPORATION and Chesapeake & Ohio Railway Company, Defendants.

Civ. A. No. 275.

United States District Court, W. D. Virginia, Abingdon Division.

Nov. 27, 1953.

On Motion for Dismissal Feb. 24, 1955.

438

Thomas B. Gay, A. G. Robertson, and Robert P. Buford, Jr., Richmond, Va., for plaintiff.

William A. Stuart and G. R. C. Stuart, Abingdon, Va., and A. G. Lively, Lebanon, Va., for defendant Clinchfield Coal Corp.

Strother Hynes, Richmond, Va., and Fred B. Greear, Norton, Va., for defendant Chesapeake & O. R. Co.

BARKSDALE, District Judge.

This action is a controversy between Marjorie A. Mullins, plaintiff, and Clinchfield Coal Corporation and Chesapeake & Ohio Railway Company, defendants, as to the respective rights of the parties in and to a tract of land containing 96.5 acres in Wise County, Virginia, usually referred to as the "Upper Bond Tract". The complaint herein, filed July 25, 1951, alleges that the plaintiff, by deed recorded December 19, 1944,. acquired certain coal, gas, oil and minerals upon this tract, the deed providing that "grantee shall have the right to, dig, mine, drill, prepare for market and remove or carry away the said coal, gas,. oil and minerals without liability for damages to the surface, or anything thereon, nor shall grantee be liable for damages for sinking of any water on said land, with rights of ingress and egress for purpose of exercising their mining rights hereunder", and that subsequently, defendant Clinchfield acquired surface rights in and to the aforesaid.

tract of land. The complaint further alleges that, after Clinchfield acquired the surface rights in and to this tract of land, it constructed a coal tipple and preparation plant thereon, in order to process and ship coal mined by Clinchfield from other tracts of land owned by it, and that by agreement with Clinchfield, defendant Chesapeake & Ohio constructed on the said tract its railway tracks, sidings and structures in order to serve Clinchfield's tipple and preparation plant, all in derogation of her rights. The complaint further alleges that defendant Chesapeake & Ohio changed the course of Meade Creek and relocated Virginia State Highway Secondary Route 632 on said tract, in derogation of her rights. Paragraphs 10 and 11 of the complaint are as follows:

"10. During construction of the aforesaid tipple, preparation plant, railway tracks, sidings and structures both said defendants wilfully, wantonly, wrongfully, unlawfully, maliciously, and in utter disregard of the rights of plaintiff excavated and destroyed large quantities of valuable coal belonging to plaintiff, and both said defendants also exposed to deterioration and damaged other large quantities of valuable coal belonging to plaintiff; all without compensation to plaintiff."

"11. The aforesaid tipple, preparation plant, railway tracks, sidings and structures are of such kind and character, and are so located that they occupy the surface of the aforesaid tract of land where plaintiff owns coal, gas, oil and mineral rights to such extent and in such manner that they obstruct and prevent access by plaintiff to the coal owned by her so that as a practical matter the mining of said coal is impossible and the value of all said coal is thereby destroyed, all to the irreparable damage of plaintiff."

Upon the basis of her allegations, plaintiff prays for an injunction restraining defendants from further maintenance of their structures in such manner that they obstruct her mining purposes, that defendants return Meade Creek to its former course, restore Secondary Route 632 to its former location, that the court direct defendants to accord her full and free access to her coal so that she may mine and market it, and for damages resulting to her from the unlawful acts alleged. Defendants' time to file their responsive pleadings having been extended, defendant Chesapeake & Ohio, on September 5, 1951, filed its motion for a more definite statement, and on September 6, 1951, defendant Clinchfield filed its motion for a more definite statement, supported by an affidavit. After hearing oral argument on December 6, 1951, I entered an order on December 19, 1951, requiring plaintiff, within a reasonable time, to serve upon defendants a more definite statement of her claim, in certain specified particulars. Thereafter, negotiations between the parties took place, which delayed further pleading. On July 2, 1953, plaintiff, reserving her exceptions to the action of the court in directing her to file a more definite statement and expressly objecting to such action of the court, filed her more definite statement. Defendants' time for filing their responsive pleadings having again been extended, defendant Clinchfield, on September 12, 1953, filed its motion to strike out plaintiff's more definite statement upon the ground that it failed to comply with the court's order, and to strike out the complaint upon the ground that it failed to state a claim upon which relief could be granted, and dismiss the action. On September 14, 1953, defendant Chesapeake & Ohio filed a similar motion. Thereupon, on October 2, 1953, plaintiff filed her motion for summary judgment against both defendants.

Oral argument was heard on the three pending motions, on October 13, 1953, and memoranda of counsel have been considered. Prior to the oral argument, defendant Clinchfield filed a second af-

fidavit of R. B. Hughes in support of its motion, and plaintiff filed in support of her motion her own affidavit, the affidavit of J. C. Codell, Jr., the affidavit of Cadwallader Evans, Jr., and the affidavit of David Greear, together with aerial photographs and other exhibits.

■ I will first consider the motion of defendant Clinchfield to strike out plaintiff's more definite statement, and to strike out the complaint and dismiss the action. In the oral argument on the pending motions, and in her memorandum, plaintiff, by counsel, continued to contend quite vigorously that she should not have been required to file a more definite statement, and that the court was in error in ordering her so to do. There is a great deal of diversity of opinion in the different circuits, and in different courts in the same circuit, on the matter of when more definite statements should be required. However, it appears to me that the matter is one which lies largely within the discretion of the court, and although I freely concede the possibility of error here, as I must in most any decision which I am required to make, I still feel confident that I was well within my discretion in ordering a more specific statement in this case. In my opinion, it is not an overstatement to say that the more definite statement filed by plaintiff here, does not comply with the spirit of the order entered. However, plaintiff by counsel contends that, under her conception of the applicable law, and the facts set out in her supporting affidavits, she has complied with the court's order as fully and frankly as she can. She further contends that, if she sustains by proof the allegations of Paragraphs 10 and 11 of her complaint, she is entitled to relief at the hands of this court. Clinchfield contends that, under the applicable law, it appears from the pleadings and affidavits, certainly as to paragraph 11 of the complaint, that there is no substantial issue of fact and that plaintiff is not entitled to any relief. Clinchfield also contends that the affidavits and exhibits show that plaintiff has not been damaged as alleged in Paragraph 10.

■■ As to Paragraph 10, it seems to me clear that plaintiff is entitled to recover if the allegations of this paragraph are sustained by proof, and I think the issue should be determined upon evidence rather than the meager record now before me. Nor do I believe I should undertake to pass upon the legal efficacy of Paragraph 11 until the facts have been fully developed by evidence. It seems to me that an issue of fact is already indicated by the affidavits. Under the authorities cited by plaintiff, particularly Tahir Erk v. Glenn L. Martin Co., 4 Cir., 116 F.2d 865, and upon sound principles, it is obvious that the court should not dismiss an action upon the pleadings where there is any reasonable possibility that plaintiff, within the ambit of the complaint, may establish by evidence facts which would entitle her to relief. It is therefore my conclusion to overrule Clinchfield's motion.

In regard to defendant Chesapeake & Ohio's motion to strike out plaintiff's more definite statement, to strike out her complaint, and dismiss her action, although paragraph 10 of the complaint alleges that both said defendants destroyed certain coal and damaged other large quantities thereof, the record now before me, and particularly the aerial photograph filed with plaintiff's affidavit, seems to make it clear that defendant Chesapeake & Ohio had no part in this, the damage, if any, having been done by Clinchfield in the construction of its tramway, rather than by defendant Chesapeake & Ohio in the construction of its track. Also, upon the record now before me, I fail to see how plaintiff has been damaged by the relocation of the secondary highway or the change in the course of Meade Creek. Plaintiff, by counsel, concedes that the construction by Chesapeake & Ohio of some twelve to fourteen miles of trackage from Jenkins, Kentucky, to the tract of land here in controversy, is a distinct advantage

to her. I fail to see how the construction of its tracks and side-tracks serving Clinchfield's tipple has damaged plaintiff or has constituted any infringement of her rights.

 Plaintiff, by counsel, however, vigorously contends that the erection by Clinchfield of its tipple and other structures on the tract in controversy was a tortious act, and that the Chesapeake & Ohio participated in this enterprise so as to make it occupy the status of a joint tort-feasor. I believe that the question of whether or not plaintiff is entitled to relief against defendant Chesapeake & Ohio, should be determined upon evidence rather than upon the record in its present state. It is at least conceivable to me that, if plaintiff should establish by proof her allegation under paragraph 11 of her complaint, it might be necessary to include defendant Chesapeake & Ohio in the final decree in order to grant her the full relief to which she might be entitled. It is therefore my conclusion to overrule the motion of defendant Chesapeake & Ohio.

 As to plaintiff's motion for summary judgment, I am satisfied that the record does not justify the granting of this motion. It will, therefore, be overruled. An order will be entered accordingly, and defendants will be allowed twenty days from the receipt of a certified copy of this order within which to file their responsive pleadings.

On Motion for Dismissal on Plaintiff Evidence.

This action having been tried upon the facts without a jury; and at the conclusion of the plaintiff's evidence on July 16, 1954, upon its motion, the court having dismissed this action as to the defendant, Chesapeake & Ohio Railway Company, upon the ground that the plaintiff had shown no right to relief as to it, therefore, pursuant to Fed.Rules Civ.Proc. Rules 52(a) and 41(b), 28 U.S.C.A. the court does hereby, as to plaintiff's claim against the Chesapeake & Ohio Railway Company, find the facts specially and states separately its conclusions of law thereon, a judgment of dismissal as to said Chesapeake & Ohio Railway Company having heretofore been entered on July 21, 1954.

Findings of Fact.

In November, 1944, plaintiff, Marjorie A. Mullins, purchased the coal and minerals under a boundary of land known as the Upper Bond Tract located on Meade Fork in Wise County, Virginia, for the sum of $3,250.00. In October, 1945, she was approached by representatives of the Clinchfield Coal Corporation who desired to purchase her coal and minerals under this tract. Clinchfield had purchased the surface of the Upper Bond Tract in May, 1945.

In May, 1946, the Interstate Commerce Commission decided that the Chesapeake & Ohio Railway Company would be granted permission to construct a branch line from Jenkins, Kentucky, to Meade Fork in Wise County, Virginia. Mrs. Mullins was aware of this decision and was happy about it. The work of constructing the railroad began in 1946 and by December, 1947, the grading was practically completed. The negotiations between Mrs. Mullins and Clinchfield with reference to the sale or leasing of her coal and mineral rights continued from time to time from October, 1946, until February 16, 1948, on which date Mrs. Mullins wrote Clinchfield charging that the installations of Clinchfield upon the surface of the Upper Bond Tract were so placed and arranged as to prevent her from mining her coal and accordingly asserting claims against Clinchfield, and demanding that Clinchfield remove their tipple and other installations from the Upper Bond Tract. On February 20, 1948, Mrs. Mullins addressed a letter to the Chesapeake & Ohio Railway Company advising that she had not been consulted with reference to the construction of the railroad on the Upper Bond Tract and that no financial arrangements had been made with her concerning the acquisition of

the right of way by the railroad. The general real estate agent of the Railroad acknowledged this letter and denied any liability to Mrs. Mullins.

The next communication from Mrs. Mullins to Chesapeake & Ohio Railway was through her attorney, George K. Large of Flemington, New Jersey, by letter dated September 4th, requesting the construction of a siding to be used by Mrs. Mullins in mining her coal. This request was handled promptly by the Railroad Company and resulted in a formal application from Mrs. Mullins for a 32 car siding on the Upper Bond Tract. The matter progressed through correspondence until December 15th when the Railway Company addressed a letter to Mrs. Mullins inquiring as to whether she was still interested in the 32 car siding as nothing had been heard from her for some time. She did not answer this letter. On January 13, 1949, another letter was sent to her advising that since she had not answered the letter of December 15th the Railway Company presumed that she was no longer interested in the siding and was accordingly closing its file. To this Mrs. Mullins replied that she was still interested and asked that the file be not closed but that the application be allowed to remain as pending. This was done.

The next communication from Mrs. Mullins was on November 28, 1949, when she asked that the application for a siding be again considered. From this date until December, 1950, there was a great deal of correspondence between Mrs. Mullins and various representatives of the Chesapeake & Ohio Railway Company with reference to sidings which she desired to construct on the Upper Bond Tract. During this period Mrs. Mullins changed her application from a 32 car siding to a 20 car siding, then to a 10 car siding, and then to a 40 car siding. In July, 1950, she withdrew her application for the siding altogether and subsequently in the same month asked that it be reinstated. During this same period she changed the number of load-ing tracks which she desired from three to two to one. It is apparent from the correspondence and other evidence that the Chesapeake & Ohio Railway Company stood ready and willing to assist Mrs. Mullins in the construction of a siding for the loading of her coal at any time that she desired to go ahead with same, but that Mrs. Mullins was not acting in good faith.

The Railway Company is charged with changing the course of Meade Creek and the location of State Route No. 632 on the Upper Bond Tract. These changes were made in the construction of the railroad, but the evidence shows that they were surface matters and that the railroad had a right to make the changes under its agreement with Clinchfield for the use of the surface of the land as its right of way. These changes did not in any way interfere with Mrs. Mullins and her rights to the coal and minerals under the boundary of land, as a matter of fact, they worked to her benefit.

The evidence fails to show any ulterior motive on the part of the railroad in not building the siding. It further fails to show any conspiracy or collusion as between the Railroad Company and Clinchfield against the interests of Mrs. Mullins. She admits that the construction of the railroad to the Upper Bond Tract was of great advantage to her and increased the value of her coal and mineral rights.

It is alleged that the Chesapeake & Ohio Railway Company in the construction of its railroad took or destroyed a portion of Mrs. Mullins' coal. The evidence fails to substantiate this charge. It is true the railroad at one point near the eastern boundary of the Upper Bond Tract is over a portion of a small vein of coal referred to as the Blair Seam. This seam of coal is unminable, even if the railroad were not there. Plaintiff has no present intention of attempting to mine this seam.

## Conclusions of Law.

Upon the facts found, I conclude that plaintiff, Marjorie A. Mullins, is entitled to no relief from, or damages against, the defendant, Chesapeake & Ohio Railway Company, and that plaintiff's action against Chesapeake & Ohio Railway Company must be dismissed at her costs.

## On the Merits.

This action having been tried upon the facts by the court without a jury, pursuant to Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.A., the court doth hereby find the facts specially, states separately its conclusions of law thereon, and directs the entry of an appropriate judgment as follows:

## Findings of Fact.

1. The plaintiff is a resident of the State of New Jersey and the defendant is a corporation organized and existing under the laws of the Commonwealth of Virginia. The amount involved exceeds $3,000, so the court has jurisdiction by reason of diversity of citizenship.

2. The plaintiff, Marjorie A. Mullins, acquired title on November 22, 1944, to the mineral and mining rights in the Upper Bond Tract located on Meade Fork of Bold Camp Creek in Wise County, Virginia, containing 96.5 acres, for a consideration of $3,250; and defendant Clinchfield Coal Corporation acquired the residue of the title to said tract on May 3, 1945, for a consideration of $2,500.

3. Two seams of coal outcrop on the tract, namely, the Eagle Seam (sometimes in the record called "Blair") and the Clintwood Seam. Upper Bond is in a disturbed area; the Eagle is not minable owing to its thinness and its division by partings, and the Clintwood, though a thick seam, is split by thick partings into four separate benches, which are in turn split by further partings at some points. I find that there is some minable coal in the Clintwood on Upper Bond. While I do not deem it necessary to make a finding as to how much minable coal there is on Upper Bond, nor where it is located, I find that there is minable coal there sufficient to justify plaintiff in undertaking to mine this coal if she wishes to do so. However, I am far from certain that, if she undertakes this operation at this time, it would be profitable.

4. In the Summer of 1947, Clinchfield commenced active work upon the construction of its Meade tipple and facilities on Upper Bond. Plaintiff learned of this work on October 7, 1947. She indicated no objection. On the contrary, on October 21, 1947, plaintiff initiated a course of correspondence with Clinchfield extending to February 16, 1948, looking to the lease to Clinchfield of plaintiff's interest in Upper Bond. I find that these negotiations were conducted in good faith on both sides.

5. Under date of February 16, 1948, plaintiff broke off the lease negotiations, notified Clinchfield that she planned to mine the Upper Bond coal herself, that her operations would require the entire surface of Upper Bond, and called upon Clinchfield to remove therefrom all its constructions, sidings, machinery and materials within 30 days. Clinchfield declined to comply, but offered to cooperate with plaintiff in her mining operations.

6. Up to February 16, 1948, Clinchfield had expended on Meade tipple and its other Upper Bond improvements approximately $200,000 and had committed approximately $700,000 additional. Up to the same date it had expended and committed slightly smaller amounts on opening its Meade Mine on adjacent property owned by it, to be served by Meade Tipple. On Upper Bond, the tram-track level had been fully graded, a connecting road from county road to tipple-site completed, tipple-site graded out of the hillside, railroad sidings for tipple installed, much of tipple steel-work erected and forms in place for foundations of washer, conveyer gallery from head-house to tipple partially erected, upper bin at tram-track level practically completed, wing-walls of head-house completed, run-of-mine bin, quonset hut and temporary construction building erected,

and large quantities of steel and other materials stacked on site. Since the institution of this suit, Clinchfield has made the necessary excavations into the hill side and erected a large slack bin at tram-track level, near the tipple. Chesapeake & Ohio Railway Company had completed construction of its line from Jenkins, Kentucky, to Upper Bond. Clinchfield's total investment in Meade Tipple and Meade Mine at date of trial had reached nearly $3,000,000. Meade Mine cannot be operated without the use of Meade Tipple or a comparable installation.

7. Prior to her letter of February 16, 1948, plaintiff made no objection to Clinchfield with respect to the construction of its improvements on Upper Bond.

8. I find that from and after February 16, 1948, plaintiff at no time had a bona fide present intention to mine the Upper Bond coal. I find that from and after that date her intention and efforts were to force Clinchfield to settle plaintiff's claim at a sum in excess of the value of her interest in Upper Bond.

9. I find that Clinchfield's improvements, operations and actions have not unreasonably restricted or prevented plaintiff from exercising her property rights on Upper Bond. I find that if and when plaintiff has a bona fide present intention to mine the Upper Bond coal, she is not unreasonably hindered or interfered with by Clinchfield.

10. I find that mining conditions on Upper Bond are difficult and would render mining the coal relatively expensive; that the amount of the minable coal reserves is at best limited; and that the surface installations which plaintiff would reasonably require in mining would be of a simple and inexpensive type such as is used by truck mines.

11. I find that at the date of plaintiff's acquisition of title, the usual method of mining coal, known and accepted as common practice in Wise County, Virginia, was the method known as deep-mining.

12. I find that Clinchfield, in doing the grading and making the excavations for its improvements on Upper Bond displaced certain quantities of outcrop coal and coal lying adjacent to the outcrop, consisting of 2,682 tons of Eagle Seam and 2,772 tons of the Clintwood Seam, 5,454 tons. I find that the royalty value of the coal was 25¢ per ton, making a total royalty value of the coal displaced of $1,363.50.

13. I find that Clinchfield in displacing the 5,454 tons, acted in good faith. It believed in good faith that it was within its rights as owner of the surface estate in making the excavations, and further believed in good faith that the coal displaced had no market value. The evidence does not show that this coal had any market value.

14. I find that Clinchfield did not sell, or otherwise dispose of, the displaced coal, and did not remove it from Upper Bond.

Concluding my findings of fact, I feel constrained to say that this is a remarkable suit. Plaintiff acquired the mineral rights which are the basis of her suit in November 1944 for $3,250. Defendant acquired the residue of the title to the tract here in controversy in May 1945 for $2,500, a total of $5,750. The grantor of both was a native of that vicinity and had offered to sell the entire tract, minerals and all, in 1942, for $5,000. Shortly prior to that, he had leased the coal for $25 and royalties of, first, fifteen cents, and then, twenty cents per ton. After lessee had conducted a small mining operation for less than a year, he surrendered his lease and got back his $25. No uranium, gold, oil, or gas, has been discovered on this property, nor even suspected. Yet, on the basis of her $3,250 investment, plaintiff has sought in this suit to recover $500,000 damages. At as late a date as the filing of her final brief, in the event that the injunction which she seeks should not be awarded her, plaintiff, by counsel, seriously contended that she should be awarded $139,470.75 in compensatory

damages, plus $150,000 in punitive damages, an aggregate of $289,470.75.

I am satisfied that no one could have heard the evidence in this case, and I do not believe that anyone can read the transcript of the evidence, without coming to the conclusion that this is *not* the case of a weak and relatively defenseless woman seeking redress for the oppressive and unconscionable actions of a large and souless corporation. The real situation is quite the converse. It is quite obvious from many, many circumstances disclosed by the evidence that, almost from the beginning, plaintiff has been unremitting in her efforts, not to mine her coal, but to extort a fabulous sum of money from the defendant, astronomically greater than the value of any rights which she possessed. Years before the commencement of this litigation, defendant offered her $21,210 for only the coal on the south slope of the tract here in controversy, Upper Bond, and the adjoining tract, Lower Bond, which contained much less coal, the part of the purchase price applicable to the coal on the south slope of Upper Bond being $12,390, nearly four times what she had paid for it. When in 1948 plaintiff's husband offered to settle with Clinchfield for $175,000, plaintiff testified that she refused to sign the letter making the offer, became so enraged with her husband that it almost ended in a divorce, and from then on took matters entirely in her own hands. But if it were not perfectly apparent from other evidence, plaintiff made her intentions and purposes unmistakable by her letter of April 9, 1948, to the defendant. Although she declined to name any of the attorneys referred to in the letter, the inference being that they were fictitious, she wrote Clinchfield as follows:

"I have been reliably informed by one of the most highly rated attorneys in Richmond, as well as by four attorneys in Wise County, that I am in position to demand a strong settlement. \* \* \*

"The aggregate costs to you should not be computed in the terms of the value of my coal 'even if you were to destroy it', but to the costs to you of having the courts award me a verdict and compelling you to remove your improvements or pay an equal amount."

Being of the opinion that the plaintiff has not acted in good faith, that she has never had any bona fide present intention of mining her Upper Bond coal, and that, even if she did, she would not be entitled to the relief which she has sought, I therefore, upon the facts found, set out the following conclusions of law.

### Conclusions of Law.

Upon the facts found, I make the following conclusions of law:

1. Plaintiff is not entitled to the mandatory injunction prayed for.

2. Plaintiff is not entitled to recover punitive damages on any account.

3. Plaintiff is not entitled to recover compensatory damages with respect to the coal remaining in place on Upper Bond.

4. Plaintiff is entitled to recover the royalty value of the 5,454 tons of coal displaced by Clinchfield in constructing its improvements, namely, the sum of $1,363.50.

5. Clinchfield was not guilty of wilful trespass in displacing the five thousand four hundred fifty-four (5,454) tons of coal in constructing its improvements on Upper Bond.

6. Clinchfield is entitled to recover its costs as the party substantially prevailing.

A judgment will be entered accordingly.